IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


**BENAI PADILLA**,

      Plaintiff,

    vs.                             No.  07cv933 MCA/ACT

**BOARD OF COMMISSIONERS**
**OF BERNALILLO COUNTY and**
**CINDY ROMERO,**

      Defendants.


## MEMORANDUM OPINION AND ORDER


    **THIS MATTER** comes before the Court on *Defendants' Motion to Strike Plaintiff Benai Padilla's Affidavit [Docket No. 52-5]* [Doc. 56], filed November 24, 2008.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion in part and denies it in part.  The Court further directs that Plaintiff supplement the pleadings by filing an affidavit signed and executed by Summer Bethforce, Special Investigator for the United States Government.

## I. BACKGROUND

    The following facts and/or allegations are either undisputed or are viewed in a light most favorable to the Plaintiff, Benai Padilla.  See Hook v. Regents of Univ. of Cal., 576 F.Supp.2d 1223, 1227 (D.N.M. 2008).

    At all times relevant to this action, Ms. Padilla was a student at the University of New Mexico.  While in college (and also while she was in high school), Ms. Padilla worked as a

student intern for Sandia National Laboratories ("Sandia"), contracting through Compa Industries ("Compa"). [Doc. 52; Exh. D, Padilla depo. at 26; Doc. 49; Exh. E, Padilla depo. at 23].  Ms. Padilla left Sandia to participate in a study-abroad program in Spain. [Doc. 52; Exh. D, Padilla depo. at 28].  Upon her return from Europe in 2005, Ms. Padilla had hoped to go back to her job at Sandia, but that position was filled so she accepted employment directly with Compa as an executive administrative assistant. [Doc. 49; Exh. E, Padilla depo. at 25, 28].  Through her deposition, Ms. Padilla testified that in October or November of 2006, she left Compa because the security clearance for which she had applied "never came back." [Id.; Exh. E, Padilla depo. at 28].  Ms. Padilla testified that she was never told that she had been denied a clearance, nor were the results of her background check shared with her. Ms. Padilla estimated that approximately three or four months passed between the time she applied for the security clearance and the time she left Compa. [Id.; Exh. E, Padilla depo. at 29-30].  According to Ms. Padilla, she was not asked to leave Compa; instead, she chose to leave and the only reason for her decision was that her security clearance was never returned. [Id.; Exh. E, Padilla depo. at 31].

On September 1, 2007, Ms. Padilla married Joseph Alderete, a non-party to this action.  Mr. Alderete had previously been romantically involved with Defendant Cindy Romero.  [Doc. 52; Exh. D, Padilla depo. at 16].  As a result of their relationship, which ended in October 2004, Mr. Alderete and Ms. Romero have a young daughter, of whom Ms. Romero is the custodial parent.  [See Doc. 49 at 6; see also Doc. 49; Exh. J at 1].  Pursuant to the terms of a *Stipulated Minute Order* entered in the Second Judicial District Court,

County of Bernalillo, State of New Mexico, the child spends one overnight per week with Mr. Alderete. She spends Mother's Day with Ms. Romero, Father's Day with Mr. Alderete, and Easter with Ms. Romero unless Mr. Alderete, who works for the Albuquerque Fire Department, has the day off from work. Ms. Romero and Mr. Alderete alternate their time with the child on the Fourth of July, Halloween, Thanksgiving, Christmas, and New Year's. [Doc. 49; Exhs. G, H, and I]. Each month, Mr. Alderete pays approximately $400 in child support. [See Doc. 52; Exh. A, depo. of Cindy Romero at 38; id.; Exh. D, Padilla depo. at 15-16 (explaining that Mr. Alderete pays a monthly sum of $425 plus $41 in back pay); see also Doc. 49; Exh. J, attached Worksheet "A"].

At all times relevant to this action, Cindy Romero was an employee of Defendant Bernalillo County ("the County"), working as a corrections technician at the Metropolitan Detention Center ("the MDC"), which the County operates. [Doc. 1 at 2; Doc. 7 at 2]. Corrections technicians perform duties relating to the intake and release of prisoners at the MDC, including, but not limited to, "[m]ak[ing] entries, cancellations, modifications and inquiries into applicable computer systems regarding a variety of information." [Doc. 49; Exh. B, "Corrections Technician Position Description"]. The enumerated major duties listed in the job description for a corrections technician include maintaining records; receiving, logging, and securing inmate property; collecting, preparing, and reviewing data; filing records and reports; collecting money for reports sold; drafting correspondence; and providing such administrative support as typing, word processing, and answering telephones. While the job description specifically states that it does not set forth "a comprehensive

inventory of all duties and responsibilities required of all" corrections technicians, nothing in the description suggests that corrections technicians are authorized to make arrests, maintain public order, or hold individuals in custody. [See Doc. 49; Exh. B,].  Through her deposition, Ms. Romero testified that "[p]retty much the sum of" her job involved taking and storing inmates' property; entering information from police and intake reports into MDC's "in-house" computer system; and preparing and filing court lists.  [Id.; Exh. C, Romero depo. at 22-23].  It is undisputed that at all times relevant to the instant matter, Ms. Romero was acting within the course and scope of her employment and under color of state law. [Doc. 7 at 3; Doc. 49 at 4].

On February 16, 2007, Ms. Romero altered an MDC offender booking sheet that had originally been created on November 13, 2004.  On the earlier date, Ms. Padilla had been arrested and charged with disorderly conduct as a result of her involvement in an altercation that took place outside a bar in downtown Albuquerque. [See Doc. 49; Exh. E, Padilla depo. at 70-74 and attached 2004 Offender Booking Sheet].  On the later date, Ms. Romero altered the original booking sheet, adding a charge of prostitution. [See Doc. 49 at 7; Exh. E, attached 2007 Offender Booking Sheet].  In truth, Ms. Padilla had never been arrested for prostitution. [Id.; Exh. E, Padilla depo. at 41].

Ms. Romero does not dispute that she altered Ms. Padilla's booking sheet.  To be sure, in her statement of undisputed facts, Ms. Romero states that

> [o]n February 16, 2007, over two (2) years after Benai Padilla
> had been arrested and booked on the disorderly conduct charge,
> Cindy Romero altered certain BCMDC booking information

4

> related to that arrest. Ms. Romero added a prostitution charge to
> Benai Padilla's computerized booking sheet. Ms. Romero
> printed the altered booking sheet.

[Doc. 49 at 7]. While Ms. Romero asserts that she did not provide the altered booking sheet

to anyone, she admits that she verbally raised the charge of prostitution during domestic-

relations mediation sessions and child-support hearings with Mr. Alderete and court

employees. [Id.; see also Doc. 54; sealed Exh. B (CD-ROM of child-support hearing)].  She

also admits to having discussed the prostitution charge with friends and family members.

[Doc. 49 at 7-8].

To be sure, Ms. Padilla testified that the first time she met Mr. Alderete's mother,

Patsy Lucero, Ms. Lucero asked if Ms. Padilla had ever been arrested for prostitution.  When

a shocked Ms. Padilla asked Ms. Lucero where she had heard that, "[Ms. Lucero] said Cindy

told her." [Doc. 49; Exh. E, Padilla depo. at 23].  Ms. Padilla testified that Ms. Romero and

Ms. Lucero "have an open relationship [and that] they see each other on a regular basis, and

they speak on the phone on a regular basis. . . . " [Doc. 52; Exh. D, Padilla depo. at 42].

Mr. Alderete confirmed that Ms. Romero raised the prostitution charge during

domestic-relations mediation sessions and child-support hearings, in the presence of court

personnel. [Doc. 49; Exh. D, Alderete depo. at 29-30].  He also testified that his father was

made aware of the charge. [Id.; Exh. D, Alderete depo. at 31-32].  Mr. Alderete had no other

*personal* knowledge of Ms. Romero's having told people about the prostitution charge,

although he had "heard she'[d] told one of [his] buddy's girlfriends. . . ."  [Id.; Exh. D,

Alderete depo. at 31].

Through her deposition, Ms. Padilla testified as to how the charge of prostitution has affected her.  She claims that this false charge has (1) been emotionally upsetting to her; (2) damaged her reputation; and (3) impacted her income and employment opportunities. [Doc. 52; Exh. D, Padilla depo. at 63].  According to Ms. Padilla, the prostitution charge has "pretty much totally wrecked [her] life." [Id.; Exh. D, Padilla depo. at 64].

Ms. Padilla, whose last full-time job ended in October 2007, also believes that the false prostitution charge has prevented her from finding employment, estimating that she must have applied for "like 40 or 50" positions with the City of Albuquerque alone.  [See Doc. 49; Exh. E, Padilla depo. at 95; Doc. 52; Exh. D, Padilla depo. at 64].  She does not, however, believe that the charge was related to the loss of her job in October 2007; instead, she testified that she was "told that the position was no longer needed." [Doc. 49; Exh. E, Padilla depo. at 18,  79].  With respect to having left other jobs, Ms. Padilla explained that "the sole reason" she left employment with Sandia was to take advantage of the study-abroad opportunity in Spain, and that she "chose to leave" Compa because her security clearance never came back. [Doc.49; Exh. E, Padilla depo. at 28, 31].  While Ms. Padilla testified that she "knows that Compa's aware" of the prostitution charge, and that "[i]t's possible" the prostitution charge had something to do with the fact that her clearance never came back, she also admitted that she was unaware of having been  terminated from or denied any jobs because of the charge. [Doc. 49; Exh. E, Padilla depo. at 75, 101; Doc. 52; Exh. D, Padilla depo. at 31-32]. Ms. Padilla also testified that she had not contacted the personnel offices from any of the numerous positions for which she had unsuccessfully applied since 2007, and

6

so did not know if the prostitution charge might have played a role in her non-selection. [See id.; Exh. E, Padilla depo. at 101].  In addition to the City of Albuquerque, the employers at which Ms. Padilla has applied for work include Sandia, Compa, the University of New Mexico, Intel, and "[a] few other contracting companies for Sandia. . . ."  [Id.; Exh. E, Padilla depo. at 95].

In light of Ms. Romero's actions, Ms. Padilla filed her three-count *Complaint for Due Process Violations, Defamation of Character and Tort Claims* against Ms. Romero and the Board of Commissioners of Bernalillo County.  [Doc. 1].  In her *Complaint*, Ms. Padilla alleges that (1) Ms. Romero violated her Fourteenth Amendment Due Process rights by "wrongfully alter[ing Ms. Padilla's] criminal history, so that the official records of Bernalillo County reflected that [she] had a criminal arrest record without [her] having any opportunity to respond[,]" and that the County is responsible for Ms. Romero's actions (Count I); (2) Ms. Romero defamed Ms. Padilla and the County shares liability under the theory of *respondeat superior* (Count II) and (3) the County negligently hired, supervised, retained, and managed Ms. Romero (Count III). [See generally id.].

Ms. Romero and the County have filed separate motions for summary judgment. [See Docs. 48, 49].  Among other things, Ms. Romero argues that Ms. Padilla is unable to satisfy the so-called "stigma plus" standard applicable to Fourteenth Amendment liberty interest claims based on false statements that impugn reputation and allegedly foreclose future employment opportunities. [Doc. 49 at 15-19].  Ms. Romero additionally maintains that because she was not a law enforcement officer for purposes of the New Mexico Tort Claims

Act, immunity is not waived with respect to Ms. Padilla's defamation claim. [Id. at 23-25].

Ms. Romero and the County also have filed a motion to strike certain paragraphs of Ms. Padilla's affidavit, and a motion to strike a notice of additional material fact, which defendants maintain "constitutes an improper surreply." [Doc. 70 at 2]. Because of its potential to impact resolution of the summary-judgment motions, the Court first addresses the defendants' motion to strike Ms. Padilla's affidavit.

## II. ANALYSIS

### A. *Defendants' Motion to Strike Plaintiff Benai Padilla's Affidavit [Docket No. 52-5]* **[Doc. 56]**

Ms. Romero and the County seek to strike paragraphs 4 through 9 of Ms. Padilla's affidavit on grounds including that (1) paragraphs 4 and 5 directly contradict Ms. Padilla's deposition testimony and are nothing more than an attempt to create sham issues; and (2) paragraphs 6 through 9 are not based on Ms. Padilla's personal knowledge. [See generally Doc. 56].

This Court may not disregard Ms. Padilla's affidavit merely because parts may conflict with her earlier sworn statements. See Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986). On the other hand, the Tenth Circuit has "also held that there are situations where a district court may be justified in disregarding certain contradictory testimony," such as when it determines that the affidavit amounts to an attempt to create a sham fact issue. Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 973 (10th Cir. 2001).

To determine whether a contradicting affidavit seeks to create a sham fact issue, the Tenth Circuit instructs district courts to "look[] to three factors: "whether: '(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.'" Ralston, 275 F.3d at 973 (*quoting* Rios v. Bigler, 67 F.3d 1543, 1551 (10th Cir.1995)).

In paragraph 4 of her affidavit, Ms. Padilla states that "[i]t was at [a child-support hearing conducted in February 2007] that Cindy Romero falsely stated to the Court that [Ms. Padilla] had been arrested for prostitution." [Doc. 52; Exh. E, Padilla affidavit at ¶ 4]. According to defendants, however, Ms. Padilla's deposition testimony "directly conflicts with the statement[] contained in paragraph 4 . . . of her affidavit [because d]uring her deposition, Ms. Padilla testified unequivocally that she was not present during the February 2007 domestic relations hearing when Cindy Romero allegedly told the court that [Ms. Padilla] had been arrested for prostitution." [Doc. 56 at 9].

While it is undisputed that Ms. Padilla was not present at the February 21, 2007 hearing during which Ms. Romero called her a prostitute, it also is undisputed that that hearing was audiotaped and is part of the record in this matter, having been filed as an exhibit to Ms. Padilla's response to Ms. Romero's summary-judgment motion. [See Doc. 52; Exh. B, "CD-ROM of Child Support Hearing"]. A review of that recording reveals that before the hearing began, both Ms. Romero and Mr. Alderete were put under oath, swearing "to tell the

9

truth under penalty of law." [Id.; Exh. B at 1:35:48 to 1:35:52].  After being sworn, Ms. Romero asked the hearing officer that Ms. Padilla, who had accompanied Mr. Alderete to the hearing, be excluded from the proceedings, and the hearing officer agreed to do so, explaining that closing the hearing was permissible because it was a "pretrial."  [Id.; Exh. B at 1:36:34 to 1:36:52].  Thereafter, Ms. Romero told the hearing officer that "His [Mr. Alderete's] fiancee has been in jail before—I work at MDC—for prostitution, and I have documentation on that as well." [Id.; Exh. B at 1:39:50 to 1:39:56].

The Court is not persuaded that Ms. Padilla's "unequivocal [deposition testimony] that she was not present during the February 2007 . . . hearing[,]" [see Doc. 56 at 9], constitutes testimony that "directly conflicts" with the her statement in paragraph 4 of her affidavit that "[i]t was at this hearing that Cindy Romero falsely stated to the Court that I had been arrested for prostitution."  [Doc. 52; Exh. E, Padilla affidavit at 1]. For one thing, paragraph 4 makes no mention of Ms. Padilla's presence or absence at the February hearing; instead, it simply explains that it was at that hearing that Ms. Romero accused Ms. Padilla of having been arrested for prostitution. [Id.; Exh. E, Padilla affidavit at 1].  Ms. Padilla has explained that her affidavit "merely reflects her understanding, *based upon the audio recording of the hearing submitted as an exhibit in [her] Responses*, that Cindy Romero falsely stated to the district court that [Ms. Padilla] had been arrested for prostitution." [Doc. 65 at 4 (emphasis added)].  During her deposition, Ms. Padilla explained that although she had accompanied Mr. Alderete to the hearing, she was excluded when Ms. Romero asked that she leave the room. [Doc. 56; Exh. D, Padilla depo. at 44].  She then testified that "[Mr. Alderete]

said—*well, I'm sure you've heard the tape*—but [Mr. Alderete] said right after that [Ms. Romero] came out saying that [Ms. Padilla] was a prostitute; [Ms. Romero] worked for MDC, and she obtained that information. . . ." [Id. at 34 (emphasis added)].  The Court sees nothing inconsistent—much less "directly conflict[ing]"—between paragraph 4 of her affidavit and Ms. Padilla's deposition testimony.

Nor is the Court persuaded by Ms. Romero's argument that "paragraph 4 should be stricken as it is based on hearsay, not personal knowledge and thus violates Fed.R.Civ.P. 56(e)."  [See Doc. 56 at 10].  Rule 56(e) provides, in pertinent part, that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed.R.Civ.P. 56(e).  For this reason, "hearsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat summary judgment. . . ."  Thomas v. International Business Machines, 48 F.3d 478, 485 (10th Cir. 1995).

As an initial matter, Ms. Padilla *does* have personal knowledge of Ms. Romero's statement as a result of having listened to the recording of the hearing.  Additionally, Ms. Romero's statement that Ms. Padilla was arrested for prostitution constitutes an admission by a party-opponent and, therefore, would not be objectionable as hearsay if offered at trial. See Fed.R.Evid. 801(d)(2) (expressly exempting from definition of hearsay a statement that is (1) the party's own, and (2) offered against her).  Finally, should Ms. Romero testify at trial *and* offer testimony that is inconsistent with having accused Ms. Padilla of an arrest for prostitution, the earlier statement, which was made under oath, would likely be admissible

as a Rule 801(d)(1) prior statement by a witness.  See Fed.R.Evid. 801(d)(1) (expressly

exempting from definition of hearsay a statement made while the declarant was under oath

in an earlier proceeding, where the declarant testifies at trial and is subject to cross-

examination concerning the statement).  For these reasons, the Court declines to strike

paragraph 4 of Ms. Padilla's affidavit.

The Court will, however, strike paragraph 5, in which Ms. Padilla asserts that "[t]he

February 2007 hearing did not result in [Mr. Alderete] getting increased custody of his

daughter, and as such, [he] was required to pay a larger amount of child support." [Doc. 52;

Exh. E, Padilla affidavit at ¶ 5].  As an initial matter, the Court notes that multiple reviews

of the audio recording of the hearing (at which, it is undisputed, Ms. Padilla was not present)

fail to reveal that child support was discussed at all except for the following exchange

between the hearing officer and Mr. Alderete:

> Hearing Officer:    So, sir, this is your petition and I set it for
> a pretrial.  What we generally like to do at
> pretrials is just see if you all agree on
> parentage . . . and then look at temporary
> child support and interim time sharing.
>
> Mr. Alderete:    Child support was already figured out.
> When I filled out the paperwork I had
> already put down that child support was
> figured out and . . . we've already had that
> signed off.

[Doc. 52; Exh. B at 1:35:53 to 1:36:32].  While Ms. Padilla seems to have drawn the

conclusion that Mr. Alderete's child-support payments became greater as a result of his

failure to win increased visitation during the hearing, the recording of the hearing does not

provide facts in support of such a position.  Even if it did, courts consider a number of factors—not just one—in determining whether child support modifications are warranted. See Spingola v. Spingola, 580 P.2d 958, 964-965 (N.M. 1978) (listing non-exclusive factors to be considered in modifying child support).

   "'*Generalized, conclusionary*, *unsubstantiated*, non-personal affidavits are insufficient to successfully oppose a motion for summary judgment.'"  Stone v. City of Wheat Ridge Colorado, 2009 WL 890718, at *3 (D.Colo. March 31, 2009) (*quoting* Stevens v. Barnard, 512 F.2d 876, 879 (10th Cir.1975) (emphasis added)).  Additionally, "'[b]elief, no matter how sincere, is not equivalent to knowledge.'"  Tavery v. United States, 32 F.3d 1423, 1426 n.4 (10th Cir. 1994) (*quoting* Jameson v. Jameson, 176 F.2d 58, 60 (D.C.App. 1949)).  In this case, Ms. Padilla's belief that increased child-support payments were the result of Mr. Alderete's not securing greater visitation is a conclusory belief that is not supported by the facts; it is therefore insufficient to oppose Ms. Romero's summary-judgment motion.  See Argo v. Blue Cross and Blue Shield of Kansas, Inc., 452 F.3d 1193, 1200 (10th Cir. 2006) ("[A]t the summary judgment stage, 'statements of mere belief' in an affidavit must be disregarded.); see also Carey v. Beans, 500 F.Supp. 580, 583 (E.D.Pa. 1980) (explaining that "affidavits speculating as to motivations but containing no factual support" are nonconforming.)

   Finally, the Court agrees with Ms. Romero that paragraphs 6 through 9 of Ms. Padilla's affidavit should be stricken inasmuch as the statements therein are not based on personal knowledge; instead, each of these paragraphs recounts what Ms. Padilla has learned

from Summer Bethforce, a Special Investigator for the United States Government, about what role the false prostitution charge would play if in the future Ms. Padilla were to seek another security clearance. To be sure, each of the paragraphs 6 through 9 is prefaced with either "I have been informed by Summer Bethforce," or "Ms. Bethforce has informed me." [See Doc. 52; Exh. E; Padilla affidavit at ¶¶ 6-9 (explaining that Ms. Bethforce "has informed" Ms. Padilla that a prostitution charge, even if ultimately shown to be false, will always appear during background investigations conducted on Ms. Padilla)].  To the extent that Ms. Padilla's knowledge of the matters set forth in paragraphs 6 through 9 comes from what she has learned from Ms. Bethforce, those facts are not sufficient to create a genuine issue of fact.  See Carey, 500 F.Supp. at 583 (explaining that "statements prefaced by the phrases, 'I believe' or 'upon information and belief' or those made upon an 'understanding,' . . . are properly subject to a motion to strike.").

Still, Ms. Padilla has asked that, instead of striking paragraphs 6 through 9 outright, the Court allow her the opportunity to (1) supplement her affidavit with an affidavit signed and executed by Ms. Bethforce, or (2) reopen discovery for the purpose of deposing Ms. Bethforce. [Doc. 65 at 6-7].  Ms. Padilla has directed the Court to Lighton v. Univ. of Utah, 209 F.3d 1213, 1227 (10th Cir. 2000) in support of her position that the Court has discretion to permit supplemental affidavits it finds useful for its summary-judgment determination. [Id.].

Lighton involved a 42 U.S.C. § 1983 action brought by a former University of Utah assistant professor of biology who alleged that he was constructively discharged without due

14

process following a subordinate's filing of sexual-harassment and retaliation charges against

him.  The defendants were the plaintiff's former supervisor and an assistant general counsel

for the University.  Lighton, 209 F.3d at 1217.  The district court entered summary judgment

for the defendants, and also denied the plaintiff's motion to strike a supplemental affidavit

submitted by defendant/assistant general counsel.  Id. at 1226.  The Tenth Circuit affirmed,

holding, in pertinent part, that

> Rule 6(d) of the Federal Rules of Civil Procedure states "[w]hen
> a motion is supported by affidavit, the affidavit shall be served
> with the motion." However, under Rule 56(e): "The court may
> permit affidavits to be supplemented or opposed by depositions,
> answers to interrogatories or further affidavits." Thus, *the
> district court clearly has discretion to permit supplemental
> affidavits it finds useful for summary judgment determination*.

Id. at 1227.  However, even though Lighton stands for the general proposition for which Ms.

Padilla cites it, the facts in Lighton are quite different from the facts here.

First, the supplemental affidavit at issue in Lighton was that of a party (the assistant

general counsel) to the case.  Additionally, the supplemental affidavit

> simply explain[ed] the University maintained an interim policy
> for investigation into research misconduct, and that [the
> plaintiff] did not file a formal complaint against [his
> subordinate] under that policy, but instead filed his complaint
> with the National Institute of Health. It further verifie[d] the
> Institute investigated [the plaintiff's] accusations and exonerated
> the University and [the plaintiff's subordinate].

Lighton, 209 F.3d at 1226-27.  By contrast, the supplemental affidavit that Ms. Padillla is

asking be allowed would be that of a non-party (Summer Bethforce) whose identity was not

even disclosed until the day that Ms. Padilla filed her response to Ms. Romero's summary-

judgment motion, which was nearly five months after the termination date for discovery. [See Docs. 19, 51].  The proposed supplemental affidavit also would do far more than explain and verify, as was the case in <u>Lighton</u>; to the contrary, it would set forth facts needed to establish Ms. Padilla's due process allegation.  For these reasons, and because Ms. Padilla has not justified the late disclosure of Ms. Bethforce, the County and Ms. Romero maintain that a supplemental affidavit should not be allowed. [See Doc. 66 at 6].

Pursuant to Rule 26 of the Federal Rules of Civil Procedure,

> a party must, without awaiting a discovery request, provide to the other parties . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment. . . .

Fed.R.Civ.P. 26(a)(1)(A)(i).  Rule 37 prevents a party from using such evidence unless the failure to identify or disclose "was substantially justified or is harmless."  Fed.R.Civ.P. 37(c)(1).  Moreover, "[t]he exclusion of evidence presented out of time is 'automatic and mandatory' unless the violation was either justified or harmless."  <u>Vesom v. Atchison Hosp. Ass'n</u>, 279 Fed.Appx. 624, 631 (10th Cir. 2008).  While the Court "need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose[,]" factors to consider include "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness."  <u>Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.</u>, 170 F.3d

985, 993 (10th Cir. 1999).

In this case, Ms. Padilla has offered no reason at all for failing to disclose Ms. Bethforce until after discovery closed and on the very day she filed her summary-judgment responses. [See Doc. 65 at 5-7.]  Additionally, rather than provide a specific date that Ms. Padilla became aware of Ms. Bethforce and the substance of Ms. Bethforce's knowledge, Ms. Padilla states in a footnote that "[t]hough not contained in Ms. Padilla's affidavit, the information which she obtained from Ms. Beckforce [sic] was, on information and belief, obtained close to the time that the affidavit was prepared.  The identity of Ms. Beckforce [sic] was seasonably disclosed by counsel when the information became known to counsel." [Doc. 65 at 6, n.1].

Ms. Romero's First Set of Interrogatories requested "names, addresses and phone numbers of all individuals known to [Ms. Padilla], or to her counsel, who may have knowledge . . . relevant to any of the issues involved in" the case. [Doc. 56; Exh. C at 2]. Ms. Padilla's Answers, which were served on April 30, 2008, did not include Ms. Bethforce, nor did her Supplemental Answers, which were served on June 3, 2008. [See Docs. 29, 32]. Additionally, persuasive authority states that a party "ha[s] a right to prepare [her] case based on the facts developed as of [the date on which discovery closes]." Henry v. Quicken Loans Inc., 2008 WL 4735228, at *5 (E.D.Mich. Oct. 15, 2008).

On the other hand, *binding* authority states that "[n]otwithstanding Rule 37(c), the district court may be found to have abused its discretion if the exclusion of testimony results in fundamental unfairness. . . ." Orjias v. Stevenson, 31 F.3d 995, 1005 (10th Cir. 1994); see

17

also <u>Smith v. Ford Motor Co.</u>, 626 F.2d 784, 794 (10th Cir. 1980). Fundamental unfairness is assessed in light of the totality of the circumstances, with the focus being simply whether one side to the litigation "receive[s] fair consideration of [her] claims" against the other. <u>See</u> <u>Voegeli v. Lewis</u>, 568 F.2d 89, 96 (8th Cir. 1977) (pivotal expert testimony offered by defendant in medical-malpractice action was result of discovery rulings that unfairly prejudiced plaintiffs in the presentation of what was otherwise a "very strong case" for them). The Tenth Circuit has specifically stated that "[d]etermination of the correct sanction for a discovery violation is a fact-specific inquiry that the district court is best qualified to make." <u>Ehrenhaus v. Reynolds</u>, 965 F.2d 916, 920 (10th Cir. 1992).

In this case, the Court agrees with Ms. Romero that Ms. Padilla's failure to disclose Ms. Bethforce prior to the filing of her summary-judgment response, which occurred nearly five months after the close of discovery, as well as Ms. Padilla's failure to explain with any precision when she spoke to Ms. Bethforce, are at the very least contrary to the spirit of the Federal Rules of Civil Procedure. However, the Court concludes that, given the unique circumstances of this case, the harm to Ms. Padilla in preventing her from supplementing her pleadings with an affidavit signed and executed by Ms. Bethforce far outweighs the harm to Ms. Romero in permitting the affidavit and, if necessary, reopening discovery for the limited purpose of deposing Ms. Bethforce. <u>But see</u> <u>Richmond Boro Gun Club, Inc. v. City of New York, N.Y.</u>, 1992 WL 314896, at *2 (E.D.N.Y. Oct. 13, 1992) (rejecting plaintiffs' contention that court must allow affiant to be impeached by deposition and explaining that the language of Rule 56(e) "suggests that it is within the discretion of the court whether to

allow an affiant to be deposed.").

Ms. Romero freely admits that, in her position as a County corrections technician and under color of state law, she altered Ms. Padilla's computerized booking sheet which, prior to Ms. Romero's interference reflected only an arrest for disorderly conduct, to add a false charge of prostitution. [Doc. 49 at 7].  She then raised this false charge of prostitution as fact on multiple occasions, including in front of court personnel, while she was under oath.[1] [See id. at 7-8]. Ms. Romero also "concedes that her false statements impugned Ms. Padilla's reputation." [Id. at 14].  However, Ms. Padilla seeks to establish that Ms. Romero's actions did more than just damage her reputation (which, in and of itself, would not amount to a constitutional violation) inasmuch as she seeks to show that Ms. Romero's actions have placed a tangible burden on her employment prospects.  Without the information that Ms. Bethforce purportedly is able to provide, Ms. Padilla is unable to satisfy the elements of her claim.

Moreover, it is questionable whether Ms. Padilla would be able to defeat a summary-judgment motion directed at her defamation claim, as Ms. Romero may very well be immune from liability under the applicable provision of the New Mexico Tort Claims Act.[2, 3]

---

[1]  The Court makes no determination as to the effect, if any, that Ms. Romero's statements, made during judicial proceedings, would have on Ms. Padilla's Fourteenth Amendment claims. [See Doc. 49 at 17 n. 4 (explaining that statements made during judicial proceedings do not support a liberty interest claim).  Instead, the Court mentions Ms. Romero's repeating of the statements as an example of the behavior that Ms. Romero has admitted.

[2]  Section 41-4-12 of the New Mexico Tort Claims Act ("NMTCA") states:

> The immunity granted pursuant to Subsection A of Section 41-4-4
> NMSA 1978 does not apply to liability for personal injury, bodily

Accordingly, absent an affidavit from Summer Bethforce, Ms. Padilla would likely be left without any remedy at all; the Court determines that, particularly in light of the conduct in which Ms. Romero has admitted engaging, such an outcome would be fundamentally unfair. The Court has weighed this potential harm against the harm likely to befall Ms. Romero should Ms. Bethforce's affidavit be allowed (*i.e.*, additional expenses likely to be incurred, as well as a rescheduled trial setting) and finds that fundamental fairness dictates that the affidavit be permitted.   The Court does not intend to minimize Ms. Padilla's discovery violation, and it has very seriously considered Ms. Romero's argument that Ms. Padilla's "gamesmanship should not be countenanced."   [Doc. 65 at 6].   However, in light of the conduct in which Ms. Romero has admittedly engaged, she is hardly in a position to suggest to this Court what sort of behavior should and should not be tolerated.

---

> injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, *defamation of character*, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico *when caused by law enforcement officers* while acting within the scope of their duties.

N.M. STAT. ANN. § 41-4-12 (1978) (emphasis added).   As previously explained, at all relevant times Ms. Romero served as a County corrections technician and, given the job description for that position, it is unlikely that Ms. Romero could be considered a "law enforcement officer" for purposes of the NMTCA.

[3]  Additionally, while Ms. Romero argues that Ms. Padilla's liberty interest claim must fail because she has an adequate post-deprivation remedy in a state tort action, she simultaneously maintains that Ms. Padilla's defamation must be dismissed as meritless "because it is not authorized under the express provisions of the New Mexico Tort Claims Act." [Doc. 49 at 23].

20

## III. CONCLUSION

For the reasons stated herein, the Court will grant in part and deny in part *Defendants' Motion to Strike Plaintiff Benai Padilla's Affidavit [Docket No. 52-5]*.  The Court will strike paragraph 5 and paragraphs 6 through 9.  However, the Court will also grant Ms. Padilla leave to supplement the filings with a signed and executed affidavit from Summer Bethforce.  Pursuant to Rule 56(e), Ms. Romero will be allowed to oppose Ms. Bethforce's affidavit by "further affidavit[]."  Fed.R.Civ.P. 56(e).

**IT IS, THEREFORE, ORDERED** that *Defendants' Motion to Strike Plaintiff Benai Padilla's Affidavit [Docket No. 52-5]* [Doc. 56] is **GRANTED** with respect to paragraph 5;

**IT IS FURTHER ORDERED** that *Defendants' Motion to Strike Plaintiff Benai Padilla's Affidavit [Docket No. 52-5]* [Doc. 56] is **GRANTED** with respect to paragraphs 6 to 9;

**IT IS FURTHER ORDERED** that *Defendants' Motion to Strike Plaintiff Benai Padilla's Affidavit [Docket No. 52-5]* [Doc. 56] is **DENIED** with respect to paragraph 4;

**IT IS FURTHER ORDERED** that Plaintiff Benai Padilla is hereby directed to supplement the pleadings with a signed and executed affidavit from Summer Bethforce, Special Investigator for the United States Government, on or before two weeks from the entry on the docket of this *Order*;

**IT IS FURTHER ORDERED** that, pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, Ms. Romero may oppose Ms. Bethforce's affidavit by further affidavit;

**IT IS FURTHER ORDERED** that any opposing affidavit filed by Ms. Romero shall be filed on or before two weeks from the entry on the docket of Ms. Bethforce's affidavit.

**SO ORDERED** this 2nd day of June, 2009, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

22